## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

_____
                                         )
United States of America,                )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )   Civil Action No. __21-12928__
                                         )
                                         )
Diesel Ops LLC,                          )
Orion Diesel LLC, and                    )
Nicholas Piccolo,                        )
                                         )
                    Defendants.          )
_____)

## COMPLAINT

The United States of America ("United States"), by the authority of the

Attorney General of the United States and at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), files this Complaint and

alleges as follows:

## I.    NATURE OF THE CASE

1.    This is a civil action brought under Sections 203, 204, and 205 of the

Clean Air Act ("CAA"), 42 U.S.C. §§ 7522–24, seeking injunctive relief and the

assessment of civil penalties against Diesel Ops LLC ("Diesel Ops") and Orion

Diesel LLC ("Orion Diesel") (together, the "Corporate Defendants"), for violations

of the CAA because Corporate Defendants manufactured, sold, and/or offered to

1

sell, and/or caused the manufacture, sale and/or offer for sale of, numerous aftermarket products that bypass, defeat, or render inoperative emission controls installed on motor vehicles or motor vehicle engines in violation of the CAA.  The United States also brings this action for violations of Section 208(a) of the CAA, 42 U.S.C. § 7542(a) by Nicholas Piccolo.  Finally, pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. §§ 3001-3308, the United States seeks to unwind or to recover certain transfers made to Nicholas Piccolo by Diesel Ops.

## II.      JURISDICTION

2.      This Court has jurisdiction over the subject matter of and the parties to this action pursuant to Sections 204 and 205(b) of the CAA, 42 U.S.C. §§ 7523 and 7524(b), 28 U.S.C. § 3004(b) (FDCPA), 28 U.S.C. §§ 1331 (Federal Question), 1345 (United States as Plaintiff), and 1355 (Fine, Penalty, or Forfeiture).

3.      Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1391(b)(1), 1391(b)(2), 1391(c)(2), 1395(a), and 3004(b), as well as Sections 204 and 205(b) of the CAA, 42 U.S.C. §§ 7523 and 7524(b), because it is the judicial district in which the Corporate Defendants have been doing business, in which Mr. Piccolo resides, and/or in which a substantial part of the alleged violations in the Complaint occurred.

### III.    <u>DEFENDANTS</u>

4.     Diesel Ops and Orion Diesel are registered as limited liability companies in Michigan.

5.     The registered address for Diesel Ops is 2956 Frembes Road, Waterford, Michigan 48329.

6.     The registered address for Orion Diesel is 30100 Telegraph Road, Suite 360, Bingham Farms, Michigan 48025.

7.     Each Corporate Defendant is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

8.     Mr. Piccolo was the founder and was an employee of Diesel Ops.  Mr. Piccolo is also a member of both Diesel Ops and Orion Diesel.

9.     Mr. Piccolo is a person within the meaning of 28 U.S.C. § 3002(10), an "insider" within the meaning of 28 U.S.C. § 3301(5)(A)(iv), and a person to whom a fraudulent transfer was made within the meaning of 28 U.S.C. § 3304.

### IV.    <u>BACKGROUND</u>

10.     This action arises under Title II of the CAA, as amended, 42 U.S.C. §§ 7521–90, and the regulations promulgated thereunder relating to the control of emissions of air pollution from motor vehicles and motor vehicle engines.

## A.    Statutory and Regulatory Overview of the Clean Air Act

11.    In creating the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).  Congress's purposes in creating the CAA were "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution."  42 U.S.C. § 7401(b)(1)-(2).

12.    "Motor vehicle" is defined in the CAA as "any self-propelled vehicle designed for transporting persons or property on a street or highway."  42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

13.    Title II of the CAA and the regulations promulgated thereunder establish standards for the emissions of air pollutants from motor vehicles and motor vehicle engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7521(a).  These pollutants include nitrogen oxides ("$NO_x$"), particulate matter ("PM"), non-methane hydrocarbons ("NMHCs"), and carbon monoxide ("CO"). 42 U.S.C. § 7521(a)(3)(A).

14.     EPA has also established National Ambient Air Quality Standards for certain pollutants, including ozone, $NO_x$, PM, and CO.  *See* 40 C.F.R. §§ 50.1-50.19.

15.     Ozone (ground level) is a highly reactive gas that is formed in the atmosphere from emissions of other pollutants, including emissions from motor vehicles.

16.     PM is a form of air pollution composed of microscopic solids and liquids suspended in air.  PM is emitted directly from motor vehicles and is also formed in the atmosphere from other pollutants, including pollutants emitted from motor vehicles.

17.     $NO_x$ and NMHCs are reactive gases that contribute to the formation of ozone and PM.

18.     Exposure to ozone and PM is linked to respiratory and cardiovascular health problems as well as premature death.  Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to ozone or PM exposure.

19.     CO is a toxic gas that forms when the carbon in fuel does not burn completely.  CO is harmful to human health because it reduces oxygen delivery to the body's organs and tissues.  CO can cause headaches, dizziness, vomiting,

nausea, loss of consciousness, and death.  Long-term exposure to CO has been associated with an increased risk of heart disease.

### B. EPA's Certificate of Conformity Program for New Motor Vehicles and Motor Vehicle Engines

20.    Manufacturers of new motor vehicles or motor vehicle engines must apply for and obtain a certificate of conformity ("COC") from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new motor vehicle or motor vehicle engine in the United States.  42 U.S.C. § 7522(a)(1).

21.    To obtain a COC, the original equipment manufacturer ("OEM") must demonstrate that each class or category of motor vehicle or motor vehicle engine it intends to sell will conform to established emissions standards for $NO_x$, PM, NMHCs, CO, and other pollutants during the motor vehicle or motor vehicle engine's useful life.  42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

22.    The COC application must include a description of the motor vehicle's emission control system and fuel system components.  40 C.F.R. §§ 86.094-21(b)(1), 86.1844-01(d)–(e).

23.    Once issued by EPA, a COC covers only those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the COC application for the class or category of vehicles or engines.  40 C.F.R. § 86.1848-01(c)(6).

**C.     Acts Prohibited by Section 203 of the Clean Air Act**

24.     Section 203(a)(3)(A) of the CAA, 42 U.S.C. § 7522(a)(3)(A), states

that the following acts are prohibited:

> for any person to remove or render inoperative any device or
> element of design installed on or in a motor vehicle or motor
> vehicle engine in compliance with the regulations [promulgated
> under Title II of the CAA] prior to its sale and delivery to the
> ultimate purchaser, or for any person knowingly to remove or
> render inoperative any such device or element of design after
> such sale and delivery to the ultimate purchaser.

25.     Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), states

that the following acts are prohibited:

> for any person to manufacture or sell, offer to sell, or install, any part
> or component intended for use with, or as a part of, any motor vehicle
> or motor vehicle engine, where a principal effect of the part or
> component is to bypass, defeat, or render inoperative any device or
> element of design installed on or in a motor vehicle or motor vehicle
> engine in compliance with regulations [promulgated under Title II of
> the CAA], and where the person knows or should know that such part
> or component is being offered for sale or installed for such use or put
> to such use.

26.     Section 203(a) also prohibits any person from causing a violation of

Section 203(a)(3)(A) or (B).  42 U.S.C. § 7522(a).

27.     Any person violating Section 203(a)(3)(A) or (B) of the CAA, 42

U.S.C. § 7522(a)(3)(A) or (B), is subject to injunctive relief and civil penalties of

up to $3,750 for each violation occurring on or after January 13, 2009, through

November 2, 2015, and up to $4,876 for each violation occurring after

November 2, 2015, and assessed on or after December 23, 2020, in accordance

with Section 205(a) of the CAA.  42 U.S.C. § 7524(a) as modified by 40 C.F.R.

§ 19.4 and 85 Fed. Reg. 83,818 (Dec. 23, 2020).

28.     Each part or component manufactured, sold, offered for sale, or

installed in violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C.

§ 7522(a)(3)(B), is a separate violation of Section 203(a)(3)(B), 42 U.S.C.

§ 7522(a)(3)(B); 42 U.S.C. § 7524(a).

### D.     Emissions-Related Elements of Design

29.     An "element of design" is "any control system (*i.e.,* computer

software, electronic control system, emission control system, computer logic),

and/or control system calibrations, and/or the results of systems interaction, and/or

hardware items on a motor vehicle or motor vehicle engine."  40 C.F.R. §§ 86.094-

2 and 86.1803-01 (General Compliance Provisions for Control of Air Pollution

from New and in-Use Light-Duty Vehicles, Light-Duty Trucks, and Heavy-Duty

Vehicles).

30.     An "[e]mission control system is a unique group of emission control

devices, auxiliary emission control devices, engine modifications and strategies,

and other elements of design designated by the Administrator [of EPA] used to

control exhaust emissions of a vehicle."  40 C.F.R. § 86.1803-01.

31.     OEMs install a variety of software and hardware elements of design and emission control systems in motor vehicles and motor vehicle engines to monitor and control emissions of pollutants in order to comply with the CAA and the regulations promulgated thereunder and to obtain a COC. These elements of design and emission control systems are hereinafter referred to in this Complaint as "Emissions-Related Elements of Design," or as a single "Emissions-Related Element of Design."

32.     Emissions-Related Elements of Design generally include both the specific hardware described in Paragraphs 33-37 below and the software that controls operation of that hardware.

33.     Motor vehicles are equipped with "Electronic Control Units" or "ECUs" (also known as an "engine control module" or "ECM"), which are on-board computer systems that run software that monitors and controls vehicle operations, including the operation of Emissions-Related Elements of Design.

34.     Motor vehicles are also equipped with auxiliary emission control devices ("AECDs") which are Emissions-Related Elements of Design that sense temperature, motive speed, engine revolutions per minute ("RPM"), transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of a motor vehicle's emission control system. 40 C.F.R. § 1037.801.

35.     Diesel engines produce high combustion temperatures that result in the production of $NO_x$.  An Exhaust Gas Recirculation System ("EGR System") is an Emissions-Related Element of Design that reduces $NO_x$ emissions by recirculating a portion of engine exhaust gas back through the engine's cylinders, thereby lowering combustion temperature and reducing $NO_x$ formation.  The EGR System includes, but is not limited to, the EGR cooler, throttle valve, other valves, piping, flanges and gaskets, as well as various other hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations) and other components that collectively constitute the system for implementing this emissions control strategy. The EGR System is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522 (a)(3)(B).

36.     As an alternative or in addition to EGRs, OEMs typically equip motor vehicles with one or more Aftertreatment Systems "whose design function is to reduce emissions in the engine exhaust before it is exhausted to the environment." *See* 40 C.F.R. § 1068.30.  A motor vehicle's Aftertreatment System consists of hardware installed in the stock exhaust system, as well as software that runs on one or more ECUs and directs operation of the hardware components.  Diesel Particulate Filters ("DPFs"), Diesel Oxidation Catalysts ("DOCs"), Selective Catalytic Reduction ("SCR") Systems, and $NO_x$ Adsorption Catalysts ("NACs")

are components of the Aftertreatment System that OEMs employ to control the emission of pollutants.

a.     A DPF is an Emissions-Related Element of Design that captures and filters soot from engine exhaust, thereby decreasing PM emissions.  By design, soot that collects in the DPF is periodically burned off by elevated exhaust temperatures in a process referred to as active or passive regeneration. The DPF includes all hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations), and other components that collectively constitute the system for implementing this emissions control strategy.  The DPF is a "device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.S.C.  § 7522(a)(3)(B).

b.     A DOC (a type of "catalytic converter" or "catalyst") is an Emissions-Related Element of Design that consists of a precious-metal coated, flow-through honeycomb structure.  As exhaust gas passes through the DOC, the coating of precious metal causes a catalytic reaction that breaks down CO and NMHCs in the exhaust into their less harmful components.  The DOC includes all hardware, parts, sensors, subassemblies, AECDs, ECU software (calibrations), and other components that collectively constitute the system for implementing this emissions control strategy.  The DOC is a "device or element

of design installed on or in a motor vehicle or motor vehicle engine in

compliance with [CAA] regulations" within the meaning of Section

203(a)(3)(B) of the CAA, 42 U.S.C.§ 7522(a)(3)(B).

      c.      An SCR system (a type of "catalytic converter" or "catalyst") is an

Emissions-Related Element of Design that reduces $NO_x$ emissions by

chemically converting exhaust gas that contains NOx into nitrogen and water

through the injection of diesel exhaust fluid, typically composed of urea.  The

SCR includes all hardware, parts, sensors, subassemblies, AECDs, ECU

software (calibrations) and other components that collectively constitute the

system for implementing this emissions control strategy.  The SCR is a "device

or element of design installed on or in a motor vehicle or motor vehicle engine

in compliance with [CAA] regulations" within the meaning of Section

203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).

      d.      A NAC (a type of "catalytic converter" or "catalyst," also known

as a "$NO_x$ trap"), is an Emissions-Related Element of Design that reduces $NO_x$

emissions by chemically adsorbing $NO_x$ from exhaust gas.  The NAC includes

all hardware, parts, sensors, subassemblies, AECDs, ECU software

(calibrations) and other components that collectively constitute the system for

implementing this emissions control strategy.  The NAC is a "device or element

of design installed on or in a motor vehicle or motor vehicle engine in

compliance with [CAA] regulations" within the meaning of Section

203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).

37.    The CAA requires OEMs to install an On-Board Diagnostics System

("OBD System") on motor vehicles.  42 U.S.C. § 7521(m).  The OBD System,

which is an Emissions-Related Element of Design, monitors, detects, reports, and

records malfunctions of monitored Emissions-Related Elements of Design and

other components through the controller area network installed throughout the

motor vehicle or motor vehicle engine.  40 C.F.R. §§ 86.007-17, 86.010-18, and

86.1806-05.  The OBD System monitors sensor inputs for malfunction or

deterioration that could cause a vehicle to fail to comply with CAA emissions

standards and may command the ECU to alter vehicle operation so that

malfunctions can be corrected.  The OBD System includes hardware, parts,

sensors, subassemblies, AECDs, ECU software (calibrations) and other

components that collectively constitute the system.  The OBD System is a "device

or element of design installed on or in a motor vehicle or motor vehicle engine in

compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B)

of the CAA, 42 U.S.C. § 7522(a)(3)(B).

a.    CAA regulations require that when the OBD System detects a

malfunction of an emissions-related system or component, it must illuminate

the vehicle's malfunction indicator light ("MIL" also known as a "check engine

13

light") on the dashboard.  *See* 40 C.F.R. § 86.1806-05(b)-(d).

b.      CAA regulations require that once the MIL has been illuminated, the OBD must record a diagnostic trouble code ("DTC").  40 C.F.R. § 86-1806-05(e).  The OBD stores DTCs that service personnel can read in order to diagnose and repair a vehicle and government inspectors can download to verify a vehicle's compliance with emissions standards.

c.      The OBD may also prompt a driver to correct a problem by altering vehicle performance, such as by putting the vehicle into "limp-home mode."  *See* 40 C.F.R. § 86.010-2.  In limp-home mode, the ECU commands the engine to downgrade performance so that the driver is aware that there is a problem with the emission control system, while permitting the vehicle to be driven (albeit slowly) to a service station.  *See, e.g.,* 40 C.F.R. § 86.004-25(b)(6)(ii) (requiring the vehicle performance to deteriorate to a point unacceptable for typical driving when diesel exhaust fluid replenishment is required).

38.      Certified Stock Calibrations.  OEMs install a suite of pre-set software calibrations for operational parameters ("Certified Stock Calibrations").  These calibrations, which are Emissions-Related Elements of Design, control all aspects of vehicle and engine operation including combustion, performance, and operation of EGR and Aftertreatment Systems.  The Certified Stock Calibrations for a particular engine operate together to minimize and/or control the formation and

emission of pollutants and ensure the motor vehicle or motor vehicle engine can meet applicable emissions requirements in the CAA and regulations promulgated thereunder.  These calibrations are disclosed in the COC application for each vehicle model because the Certified Stock Calibrations are part of a motor vehicle's overall emissions control strategy.  *See* 40 C.F.R. § 86.1844-01(e)(2) (requiring that fuel pump flow rate, fuel pressure, engine speed, EGR exhaust gas flow rate, and basic engine timing be included in the COC application).  Each Certified Stock Calibration is an "element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  The types of Certified Stock Calibrations relevant to this Complaint include, but are not limited to:

a. calibrations for parameters that affect the operation of the EGR System, including EGR flowrate and EGR cooler bypassing;

b. calibrations for parameters that affect the operation of the Aftertreatment System (the DPF, DOC, SCR, and/or NAC);

c. calibrations for parameters that affect engine combustion, performance, and operation, including air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pulse width, fuel injection pressure, fuel injection mass, multiple injection patterns, open loop/closed loop functionality and control,

ignition control (spark timing), boost pressure, limiters (fuel, torque, smoke, etc.), manifold pressure, camshaft timing, electronic throttle control, engine air flow characteristics, mass air flow rate, turbocharger/supercharger air flow, and other parameters disclosed in the COC application, which are elements of the OEM's strategy to control the formation of pollutants in the engine; and

> d.    calibrations for parameters that affect OBD detection, warning, and recording of malfunctions.

### E.    Types of Aftermarket Products at Issue in this Case

39.    Third parties, including the Corporate Defendants, manufacture, sell, and offer to sell products for use with existing motor vehicles that are designed to enhance the vehicle's power, performance, or fuel economy (hereinafter "Aftermarket Performance Products").  In some cases, these products achieve their purpose by replacing, modifying, bypassing, rendering inoperative, facilitating deletion or partial deletion of, interfering with, and/or over-writing OEM-installed Emissions-Related Elements of Design.  Such products "bypass, defeat, or render inoperative" Emissions-Related Elements of Design within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  The Aftermarket Performance Products relevant to this Complaint fall into the following three categories: EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products, and Tunes.

40.   <u>EGR Delete Hardware Products.</u>  Some aftermarket hardware products physically replace, modify, bypass, render inoperative, facilitate deletion or partial deletion of, and/or interfere with components of the EGR System.  These include, but are not limited to, exhaust manifolds that do not incorporate EGR ports designed for an engine with exhaust manifolds that contain EGR ports, plates that block the EGR System (also known as "blocker plates"), and hardware to force the throttle valve to remain fully open, which inhibits EGR flow (referred to as "throttle valve delete" equipment).  These products are collectively referred to in this Complaint as "EGR Delete Hardware Products."

41.   <u>Aftertreatment System Delete Hardware Products.</u>  Some aftermarket hardware products physically alter some or all components of a motor vehicle's Aftertreatment System by replacing, modifying, bypassing, rendering inoperative, facilitating deletion or partial deletion of, or interfering with essential physical elements of the DPF, DOC, SCR, or NAC.  This often involves removing the Aftertreatment System installed by the OEM, and replacing it with a "straight pipe" or "race pipe."  The replacement hardware does not contain emission controls such as DPF, SCR, DOC, and/or NAC.  These products are collectively referred to in this Complaint as "Aftertreatment System Delete Hardware Products."

42.   Tunes.  Other aftermarket products consist of software that is uploaded into a motor vehicle's ECUs and replaces, modifies, bypasses, renders inoperative, facilitates deletion or partial deletion of, overwrites, and/or interferes with one or more of a motor vehicle's or motor vehicle engine's Certified Stock Calibrations.  An individual piece of such software is commonly referred to as a "Tune," derived from its intended purpose of "tuning" the vehicle's performance. The Tunes relevant to this Complaint are referred to hereinafter as "Defeat Tunes."

a.   There are various methods by which Defeat Tunes may be programmed into the vehicle.  Tunes may be uploaded from a handheld device called a "tuner," or from a smartphone or laptop to which they are uploaded by email, or through cloud-based technology.

b.   A single Defeat Tune can alter, disable, bypass, delete and/or over-write multiple Certified Stock Calibrations and types of Certified Stock Calibrations.  For example, a tune that disables the EGR also typically changes OBD-related calibrations so that the EGR deletion will not be detected. Multiple Tunes and types of Tunes are often sold together as a single product.

c.   The Defeat Tunes relevant to this Complaint delete, modify, or overwrite the following types of Certified Stock Calibrations:

i.   *Certified Stock Calibrations relating to the EGR System*.

For example, this type of Defeat Tune may electronically disable the

18

EGR System or alter EGR-related Certified Stock Calibrations such as EGR exhaust gas flow rate.

ii. *Certified Stock Calibrations relating to Aftertreatment Systems: the DPF, DOC, SCR, or NAC.* For example this type of Defeat Tune may alter urea injection calibrations or DPF regeneration intervals.

iii. *Certified Stock Calibrations relating to engine combustion, performance and operation.* For example, this type of Defeat Tune may alter, bypass, delete, and/or over-write the Certified Stock Calibrations for combustion parameters that affect emissions such as air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pressure, and fuel injection pulse width.

iv. *Certified Stock Calibrations relating to OBD functions.* For example, this type of Defeat Tune may prevent the *generation* and recording of DTCs and may prevent the OBD from putting the vehicle into "limp-home mode" due to changes in Certified Stock Calibrations or removal of or changes to the EGR System or Aftertreatment System.

**F.     EPA's Information Gathering Authority Under the Clean Air Act**

43.     Section 208(a) of the CAA, 42 U.S.C. § 7542(a), requires persons subject to Title II, Part A to maintain records and to provide information that EPA may reasonably require to determine whether the person has acted or is acting in compliance with the mobile source provisions of the CAA.  42 U.S.C. § 7542(a).

44.     Under Section 203(a)(2)(A) of the CAA, 42 U.S.C. § 7522(a)(2)(A), it is a prohibited act for any person to fail to provide information required under Section 208.

45.     Any person violating Section 203(a)(2)(A) of the CAA, 42 U.S.C. § 7522(a)(2)(A), is subject to civil penalties of up to $48,762 per day for each violation occurring after November 2, 2015, and assessed on or after December 23, 2020.  42 U.S.C. § 7524(a), as modified by 40 C.F.R. § 19.4 (2019) and 85 Fed. Reg. 83,818 (Dec. 23, 2020).

46.     Section 204 of the CAA, 42 U.S.C. § 7523, provides that "district courts of the United States shall have jurisdiction to restrain violations" of Section 203(a), 42 U.S.C. § 7522(a).

**G.     Federal Debt Collection Procedures Act**

47.     The FDCPA provides that certain transfers of assets made by those who owe a debt to the United States are fraudulent and provides remedies in the event such fraudulent transfers are made.

20

48.    The FDCPA defines "insider" to include, *inter alia,* an officer,

director, or person in control of the debtor.  28 U.S.C. § 3301(5)(B).

49.    Section 3304(b) of the FDCPA sets forth the criteria for determining

whether transfers are fraudulent, regardless of whether the transfer occurred before

or after a debt to the United States accrued:

> (b)  Transfers without regard to date of judgment.—
>
> (1)  Except as provided in section 3307, a transfer made or obligation
> incurred by a debtor is fraudulent as to a debt to the United States,
> whether such debt arises before or after the transfer is made or the
> obligation is incurred, if the debtor makes the transfer or incurs the
> obligation—
>
> > (A)   with actual intent to hinder, delay, or defraud a creditor; or
> >
> > (B)  without receiving a reasonably equivalent value in exchange for
> > the transfer or obligation if the debtor—
> >
> > > (i)   was engaged or was about to engage in a business or a
> > > transaction for which the remaining assets of the debtor were
> > > unreasonably small in relation to the business or transaction; or
> > >
> > > (ii)   intended to incur, or believed or reasonably should have
> > > believed that he would incur, debts beyond his ability to pay as
> > > they became due.

28 U.S.C. § 3304(b).

50.    Section 3304(b) of the FDCPA lists factors—known as the badges of

fraud—that may be considered in determining actual intent to defraud a creditor.

28 U.S.C. § 3304(b)(2).

51.    The badges of fraud include, but are not limited to: whether the

transfer was to an Insider, whether the debtor retained possession of the asset after

the transfer, whether the transfer occurred after the debtor had been sued or threatened with suit, whether the transfer consisted of all or substantially all of the debtor's assets, whether the value of consideration received for the transferred asset was reasonably equivalent to the value of the transferred asset, whether the debtor was insolvent or became insolvent shortly after the transfer was made, and whether the transfer occurred shortly before or shortly after a substantial debt was incurred.  28 U.S.C. § 3304(b)(2).

52.     The FDCPA provides the United States with several remedies for a fraudulent transfer: "(1) avoidance of the transfer . . . to the extent necessary to satisfy the debt to the United States; (2) a remedy [under the FDCPA] against the asset transferred or other property of the transferee; or (3) any other relief the circumstances may require."  28 U.S.C. § 3306(a).

53.     The FDCPA provides that judgment may be entered against "the first transferee of the asset or the person for whose benefit the transfer was made" or "any subsequent transferee, other than a good faith transferee who took for value or any subsequent transferee of such good-faith transferee."  28 U.S.C. § 3307(b).

## V.     <u>GENERAL ALLEGATIONS</u>

54.     Each Corporate Defendant has manufactured, sold and/or offered to sell products intended for use in "motor vehicles" as that term is defined by the

CAA, 42 U.S.C. § 7550(2), and regulations promulgated thereunder at 40 C.F.R. § 85.1703.

55.     Many of the products that the Corporate Defendants have manufactured, sold, and/or offered to sell are Aftermarket Performance Products that modify a motor vehicle's fuel economy, power, and performance.

56.     Corporate Defendants have sold and/or offered to sell, and/or caused the manufacture, sale, or offering for sale of Aftermarket Performance Products over the internet through Diesel Ops' website (www.dieselops.com), in their physical store in Waterford, Michigan, and/or through sales to other distributors or retailers that then marketed the products to consumers.

57.     Diesel Ops also advertised through other online marketplaces, such as Facebook, Instagram, Twitter, YouTube, Google, Jet.com, Newegg.com, Amazon and eBay.

58.     Corporate Defendants have manufactured, sold and/or offered to sell, or caused the manufacture, sale, or offering for sale of the following types of Aftermarket Performance Products:  EGR Delete Hardware Products, Aftertreatment Hardware Products, and Defeat Tunes.

59.     In some cases, Corporate Defendants combined different Aftermarket Performance Products together into a package; for example, by selling and/or offering for sale Aftertreatment System Delete Hardware Products that physically

23

remove system components with Defeat Tunes that electronically disable

Aftertreatment System operations as a single product (*e.g.,* delete kits).

60.    EGR Delete Hardware Products, Aftertreatment Hardware Products,

and Defeat Tunes that the Corporate Defendants have manufactured, sold, and/or

offered to sell, or that Corporate Defendants caused to be manufactured, sold, or

offered for sale, had a principal effect of bypassing, defeating, and/or rendering

inoperative Emissions-Related Elements of Design.

61.    Corporate Defendants knew or should have known that one or more of

the EGR Delete Hardware Products, Aftertreatment Hardware Products, and/or

Defeat Tunes they manufactured, sold and/or offered to sell, or for which they

caused the manufacture, sale, or offers to sell, were intended for such use or put to

such use.

62.    Diesel Ops installed EGR Delete Hardware Products, Aftertreatment

System Delete Hardware Products, and/or Defeat Tunes on motor vehicles and/or

motor vehicle engines.

63.    Diesel Ops knowingly installed EGR Delete Hardware Products,

Aftertreatment System Delete Hardware Products, and/or Defeat Tunes on motor

vehicles and/or motor vehicle engines that removed or rendered inoperative

devices and/or Emissions-Related Elements of Design that were installed on or in a

motor vehicle or motor vehicle engine in compliance with regulations under the CAA after such sale and delivery to the ultimate purchaser.

## **FINDINGS OF VIOLATIONS**

64.     On July 13, 2018, EPA issued a Finding of Violation to Diesel Ops alleging that Diesel Ops violated Sections 203(a)(3)(A) and 203(a)(3)(B) of the CAA (42 U.S.C. §§ 7522(a)(3)(A) and (B)), by selling, offering to sell, and/or installing products with a principal effect of bypassing, defeating or rendering inoperative Emissions-Related Elements of Design on motor vehicles and motor vehicle engines ("First Finding of Violation").

65.     On December 19, 2018, EPA issued a Finding of Violation to Orion Diesel alleging that Orion Diesel violated Section 203(a)(3)(B) of the CAA (42 U.S.C. § 7522(a)(3)(B)) by manufacturing, selling, and/or offering to sell products with a principal effect of bypassing, defeating or rendering inoperative Emissions-Related Elements of Design on motor vehicles and motor vehicle engines.

66.     Despite EPA's requests that Diesel Ops and Orion Diesel halt all sales of products that violate Section 203, as of February 4, 2020, Diesel Ops' website (www.dieselops.com) still listed several such products for sale at a discounted rate as part of a "Fire Sale."  These products included, but were not limited to, the "Open-Box" version of the following products:

- aFe 4" Stainless Steel DPF Delete Pipe for Dodge Cummins 6.7L 2007.5-2012 (Product No. AFE-49-42022),

- SCT GTX Programmer and Monitor (Product No. SCT-40460S), and

- aFe MACH Force XP 4" Stainless Steel Downpipe-Back Exhaust System No Muffler/Tip for GM Duramax 6.6L 2011-2015 EC/CC SB/LB (Product No. AFE-49-44031NM).

## TRANSFER OF ASSETS FROM DIESEL OPS
## TO MR. PICCOLO

67. The United States has a "claim" for civil penalties under the CAA against Diesel Ops within the meaning of 28 U.S.C. § 3301(3) (defining a "claim" as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

68. The United States is a "creditor" within the meaning of 28 U.S.C. § 3301(4).

69. The United States' claim to recover civil penalties from Diesel Ops is a "debt" within the meaning of 28 U.S.C. § 3002(3)(B) (defining "debt" to include a penalty or fine).

70. Diesel Ops is a "debtor" to the United States within the meaning of 28 U.S.C. § 3002(4).

71. On July 13, 2018, EPA issued the First Finding of Violation to Diesel Ops.

72.     The First Finding of Violation put Diesel Ops on notice of the potential penalties for these CAA violations by including the maximum penalty that could be assessed under the statute at that time ($4,619 per product, at that time).

73.     Diesel Ops' debt to the United States arose when it violated Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).

74.     During the period from March through December of 2018, Diesel Ops made substantial transfers of assets to Mr. Piccolo and other Insiders.

75.     All but one of the transfers made during this time period occurred after EPA issued the First Finding of Violation to Diesel Ops, and all of the transfers followed EPA's issuance of an information request under Section 208(a) of the CAA, 42 U.S.C. § 7542(a), on February 15, 2018 to Diesel Ops.

76.     The transfers referenced in the preceding Paragraphs were "transfer[s]" within the meaning of 28 U.S.C. § 3301(6).

77.     Mr. Piccolo is or was at the time of the transfers an "insider" within the meaning of 28 U.S.C. § 3301(5)(B).

## REQUESTS FOR INFORMATION

78.     On May 17, 2021, EPA issued an information request to Mr. Piccolo under Section 208(a) of the CAA, 42 U.S.C. § 7542(a).  In this information request, EPA requested information regarding any products sold by Mr. Piccolo in

his individual capacity that bypasses, defeats, or renders inoperative any emission control component including, but not limited to, DPFs, EGR Systems, and OBD Systems.

79.     Written responses are required within 21 days of receipt of the information request.

80.     EPA emphasized the importance of receiving written responses during a telephone call with Mr. Piccolo on June 15, 2021.  EPA sent follow-up emails on June 22, 2021 and July 8, 2021, requesting written response to the information request.

81.     On July 13, 2021, Mr. Piccolo notified EPA that he was working on responses and he planned to send the responses to EPA the following day.

82.     EPA has not received written responses to the information request from Mr. Piccolo.

**<u>FIRST CLAIM FOR RELIEF</u>**
***Violations for the Manufacture, Sale and/or Offer to Sell***
***EGR Delete Hardware Products***

83.     The preceding paragraphs of this Complaint are re-alleged and incorporated herein by reference.

84.     Beginning as early as April 15, 2015, Corporate Defendants manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale and/or offer for sale of, numerous different types of EGR Delete Hardware

Products (hereinafter "Corporate Defendants' EGR Delete Hardware Products").

Corporate Defendants' EGR Delete Hardware Products include but are not limited

to blocker plates, EGR cooler delete kits, and throttle valve delete kits.

85.    As of March 3, 2020, Diesel Ops' website referred to a category of

products called "EGR Delete Kits – EGR replacement, EGR Delete Kits . . . ."

86.    The product names for certain of Corporate Defendants' EGR Delete

Hardware Products contain the word "delete" or "block" or "blocker."  For

example, some of the EGR Delete Hardware Products have been listed on

Defendant Diesel Ops' website under the following product names:

- "Diesel Ops EGR Delete Kit w/High Flow Intake for Ford Powerstroke 6.4L 2008-2010" (Product No. OPS-EGRD-6.4-IE)

- "Diesel OPS EGR Delete Kit For Dodge Cummins 6.7L 2010-2016" (Product No. OPS-EGRD-6.7C-10)

- "Diesel Ops Tuning EGR Delete Kit for GM Duramax 6.6L LML 2011-early 2015" (Product No. OPS-EGR-11-15LML)

- "Orion Diesel EGR Delete w/Intake Pipe for Ford Powerstroke 6.4L 2008-2010" (Product No. ORD-EGRD-6.4-IE)

- "Orion Diesel EGR Delete for Dodge Cummins 6.7L 2013-2017" (Product No. ORD-EGRD-6.7C-13-17)

- "Orion Diesel Stage 2 EGR Delete for GM Duramax 6.6L LML 2011-2015.5" (Product No. ORD-EGRD-11-15LML-S2)

- "Sinister Diesel EGR Delete Kit w/Factory EGR Probe for Ford Powerstroke 6.7L 2011-2014" (Product No. SIN-SD-EGD-6.7P-FP)

- "Deviant Race Parts Basic EGR Delete Kit for Dodge Cummins 6.7L 2007-2009" (Product No. DRP-87111)

- "Flo-Pro EGR & Cooler Delete Kit for Dodge PU Cummins 6.7L 2007.5-2009" (Product No. FLO-213000)

- "No Limit EGR Block Off Plate Set for Ford Powerstroke 6.7L 2011-2016" (Product No. NLF-67PKBO)

87.    Corporate Defendants' descriptions of certain of their EGR Delete Hardware Products indicate that these products bypass, defeat, or render inoperative the EGR System.

88.    Some of the product descriptions and installation/instruction manuals for certain of Corporate Defendants' EGR Delete Hardware Products state that the product must be used with tuning that disables or allows for the disabling of the EGR System.  For example, Defendant Diesel Ops' website has described certain of Corporate Defendants' EGR Delete Hardware Products using the following statements:

- "Deleting your EGR system can result in both quicker turbo spool and lower EGTs… (WARNING, this 6.4L EGR Delete Kit can never be installed on any vehicle registered for use on highways or public streets. **Tuning is Required **" (Product No. OPS-EGRD-6.4-IE).

- "This EGR Delete kit eliminates exhaust gases recirculating through your intake manifold for increased reliability. WARNING, this item can never be installed on any vehicle registered for use on highways or public streets. *Race Tuning Required*" (Product No. OPS-EGRD-6.7C-10).

- "The EGR delete kit completely replaces your factory EGR Cooler and comes with everything to do the job… If tuning is not installed a Check Engine Light will be presented, and possible limp mode will incure [sic]. Please call if you are unfamiliar with what kind of

tuning is needed prior to purchase" (Product No. ORD-EGRD-6.4-IE).

- "This EGR Delete kit also eliminates exhaust recirculating through your intake manifold, eliminating exhaust deposits for increased reliability… WARNING, this EGR Delete Kit can never be installed on any vehicle registered for use on highways or public streets. ** RACE Tuning is Required **" (Product No. SIN-SD-EGD-6.7P-FP).

- "This kit completely removes the EGR Cooler, Crossover Tube and Actuator to clean up the engine bay and eliminate soot buildup in the intake tract" (Product No. DRP-87111).

- "This Flo-Pro EGR & Cooler Race Kit includes everything needed to remove the EGR and cooler for your 2007.5-2016 Cummins 2500/3500 pickup trucks" (Product No. FLO-301008).

89.     The product manuals and/or installation instructions for certain of Corporate Defendants' EGR Delete Hardware Products contain instructions on how to remove and replace all or part of the OEM's EGR System.  For example, the installation manual for Product No. AFE-46-90071 gives instructions for removing the EGR cooler and cooler mount.  It further instructs: "After the EGR delete is completed and the programer [sic] is installed, go for a short drive and verfiy [sic] that all connections are secure and that you have no leaks."

90.     Corporate Defendants' product manuals and/or descriptions for certain of Corporate Defendants' EGR Delete Hardware Products state that the products must be used with delete tuning.  For example, the description for Product No. ORD-EGD-KIT-11-15LML-S2 states: "In order to properly use this product, custom race tuning is required. If tuning is not installed a Check Engine Light will

be presented, and possible limp home mode will incure [sic]. Please call if you are

unfamiliar with what kind of tuning is needed prior to purchase."

91.    A motor vehicle's EGR System is a "device or element of design

installed on or in a motor vehicle or motor vehicle engine in compliance with

[CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42

U.S.C. § 7522(a)(3)(B).

92.    Each Corporate Defendant's EGR Delete Hardware Products are and

have been intended for use with certified motor vehicles and motor vehicle

engines, including Power Stroke engines in Ford vehicles, Duramax engines in GM

vehicles, and Cummins engines in Dodge vehicles.

93.    A principal effect of each Corporate Defendant's EGR Delete

Hardware Product is and has been to bypass, defeat, or render inoperative a motor

vehicle's EGR System.

94.    Corporate Defendants knew or should have known that each of

Corporate Defendant's EGR Delete Hardware Products was intended for such use

or put to such use.

95.    Each unit of Corporate Defendants' EGR Delete Hardware Products

that Corporate Defendants manufactured, sold, or offered for sale, or that

Corporate Defendants caused to be manufactured, sold, or offered to sell, is a

separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).

42 U.S.C. § 7524(a).

96.     For each violation of Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B),

Corporate Defendants are liable to the United States for injunctive relief and civil

penalties of up to the amounts set forth in Paragraph 27 above.

## SECOND CLAIM FOR RELIEF

### *Violations for the Manufacture, Sale, and/or Offer to Sell*
### *Aftertreatment System Delete Hardware Products*

97.     Paragraphs 1 through 82 of this Complaint are re-alleged and

incorporated herein by reference.

98.     Beginning as early as April 15, 2015, Corporate Defendants

manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale

and/or offer for sale of, numerous different types of Aftertreatment System Delete

Hardware Products that bypass, defeat, and/or render inoperative with one or more

Aftertreatment Systems (hereinafter "Corporate Defendants' Aftertreatment

System Delete Hardware Products").

99.     Corporate Defendants' Aftertreatment System Delete Hardware

Products include, but are not limited to, pipes commonly called "race pipes,"

"delete pipes" and/or "straight pipes" because they do not have a bulge in the pipe

for an Aftertreatment System.

100.   As of March 3, 2020, Diesel Ops' website, www.dieselops.com, had product categories called "DPF Delete Pipes."  An earlier version of Diesel Ops' website, in 2018, also advertised product categories called "SCR Delete" and "CAT Delete Pipes."

101.   The product names for certain of Corporate Defendants' Aftertreatment System Delete Hardware Products contain the word "delete."  For example, some of Corporate Defendants' Aftertreatment System Delete Hardware Products have been listed on Corporate Defendants' website under the following product names:

- "Flo-Pro 4" DPF & Cat Race Delete Pipe Aluminized for Ford Powerstroke 6.4L 2008-2010" (Product No. FLO-837NB),

- "Flo-Pro 3.5" Aluminized Steel DPF Race Delete Pipe for Ford Powerstroke 6.4L 2008-2010" (Product No. FLO-38113NB),

- "Flo-Pro DPF & Cat Delete Race Pipe Aluminized for Dodge Cummins 6.7L 2007-2012" (Product No. FLO-835NB),

- "Orion Diesel 4" Cat & DPF Aluminized Delete Pipe for GM Duramax LML 6.6L 2011-Early 2015" (Product No. ORD-DP66LML), and

- "Flo-Pro 4" Cat & DPF Race Pipes w/o 4-Bolt Flange Aluminized for GM Duramax 6.6L LML EC/CC/SB/LB 2011-2015" (Product No. FLO-862).

102.   Corporate Defendants' descriptions of certain of Corporate Defendants' Aftertreatment System Delete Hardware Products indicate that these products bypass, defeat, and/or render inoperative the Aftertreatment Systems.

Furthermore, some of the product descriptions and/or installation/instruction manuals for certain of Corporate Defendants' Aftertreatment System Delete Hardware Products state that the product must be used with tuning that disables or allows for the disabling of the Aftertreatment System.  For example, Diesel Ops' website has described certain of Corporate Defendants' Aftertreatment Delete Hardware Products as follows:

- "Must be used in conjunction with an electronic tuner…" (Product No. ORD-DP66LML),

- "This pipe is a direct fit to replace your Stock DPF system in the Exahust [sic]" (Product No. FLO-38113NB), and

- "The 4" Cat & DPF Delete pipe will eliminate the OEM Converter after the Downpipe as well as the DPF" (Product No. FLO-862).

103.   The product manuals and/or installation instructions for certain of Corporate Defendants' Aftertreatment System Delete Hardware Products contain instructions on how to remove and replace all or part of the OEM's Aftertreatment System.  For example, the manual for Orion Diesel Product No. ORD-DP-67P instructs the user to "remove the CAT/DPF section from the vehicle . . . ."  Corporate Defendants' product manuals and/or descriptions for certain of Corporate Defendants' Aftertreatment System Delete Hardware Products state that the products must be used with delete tuning.  For example, the manual for Orion Diesel Product No. ORD-DP-67P states:  "This system requires an aftermarket electronic programmer to work with the vehicle."

104.    A motor vehicle's Aftertreatment System, including DPF, SCR, NAC and DOC, is "a device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).

105.    Corporate Defendants' Aftertreatment System Delete Hardware Products are and have been intended for use with certified motor vehicles and motor vehicle engines, including Powerstroke engines in Ford vehicles, Duramax engines in GM vehicles, and Cummins engines in Dodge vehicles.

106.    A principal effect of each of Corporate Defendants' Aftertreatment System Delete Hardware Products is, and has been, to bypass, defeat, or render inoperative a motor vehicle's Aftertreatment System.

107.    Corporate Defendants knew or should have known that each of Corporate Defendants' Aftertreatment System Delete Hardware Products was intended for such use or put to such use.

108.    Each unit of each of Corporate Defendants' Aftertreatment System Delete Hardware Products constitutes a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

109.    For each violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), Corporate Defendants are liable to the United States for injunctive relief and civil penalties of up to the amounts set forth in Paragraph 45 above.

## THIRD CLAIM FOR RELIEF

### *Violations for the Manufacture, Sale, and/or Offer to Sell Defeat Tunes*

110.   Paragraphs 1 through 82 of this Complaint are re-alleged and incorporated herein by reference.

111.   Beginning as early as April 15, 2015**,** Corporate Defendants manufactured, sold, and/or offered to sell, and/or caused the manufacture, sale and/or offer for sale of, numerous different types of Defeat Tunes (hereinafter "Corporate Defendants' Defeat Tunes").

112.   Corporate Defendants' Defeat Tunes have a principal effect of allowing for the bypass, defeat, or rendering inoperative of one or more of the following types of Certified Stock Calibrations:

- Certified Stock Calibrations relating to the EGR System, as well as signals or records related to the EGR System.

- Certified Stock Calibrations relating to the Aftertreatment System, including the DPF, DOC, SCR, or NAC, as well as signals or records related to these components.

- Certified Stock Calibrations related to engine combustion, performance and operation such as air-fuel ratio, fuel injection timing, fuel quantity, fuel injection pressure, and fuel injection pulse width.

- Certified Stock Calibrations related to OBD functions in order to prevent the generation of diagnostic trouble codes, prevent the malfunction indicator light from illuminating, and prevent the OBD from putting the vehicle into "limp-home mode" due to changes in Certified Stock Calibrations or removal of the EGR System or Aftertreatment System.

113.   Corporate Defendants' product names for certain of Corporate

Defendants' Defeat Tunes include the term "delete," such as "DPF delete

programmer" and "delete tuner."

114.   For example, Diesel Ops' website has listed for sale the following

Defeat Tune products:

- "DPF-R 4.0 DPF Delete Programmer for Ford Powerstroke 6.4L 2008-2010" (Product No. GBZ-FD40),

- "Touch Screen Race Tuner DPF/EGR Delete w/ Custom Tunes for Powerstroke 6.7L 2015-2016" (Product No. TCS-6.7LPS-15-16),

- "Malone EGR Delete Tune for Volkswagen Golf/Jetta/Beetle 1.9L TDI 1998-2006" (Product No. MAL-vw-tdi-egr-del), and

- "Raceme DPF EGR Delete Race Tuner Dodge Ram Cummins Diesel 2500 3500 6.7L 2007.5-2012" (Product No. RME-Tuner-07-12).

115.   Corporate Defendants' descriptions of certain of Corporate

Defendants' Defeat Tunes indicate that these products bypass, defeat, and/or

render inoperative operation of the EGR System, Aftertreatment System, Certified

Stock Calibrations, and/or the OBD System.

116.   For example, Defendant Diesel Ops' website, www.dieselops.com,

has described certain of the Defeat Tunes Corporate Defendants offer for sale

using the following statements:

- "This product is capable of disabling emissions equipment" (Product No. H&S-109003-R),

- "These ECU's can NOT be tuned through the OBDII Port, you MUST send this to Diesel Ops for Tuning… If EGR delete is desired, then

electrically unplug it. You can also remove all EGR hardware from the car if you want to… If you are just installing a DPF delete downpipe instead of a full aftermarket exhaust, then you must hollow out (gut) the SCR cat… If you are removing all emissions, please unplug DPF Pressure Sensor and only one EGT Sensor, Unplug Adblue Injector (can be removed), Unplug 2 x NO$_x$ sensors (can be removed)… Locate the small fuse box that holds 5 fuses, next to the ECU. There are 5 different variants of this fuse box. Remove the last fuse or #F05. It's typically the 30A Fuse" (Product No. MAL-335d-x5d-stage-2-tune),

- "The DPF-R 4.0 is designed to be a fully reversible and temporary DPF delete for trucks equipped with DPF filters… Reprograms the ECU for trouble free EGR/CAT/DPF delete" (Product No. GBZ-FD40),

- "It disables regen and you will be able to delete the CAT, DPF and EGR Valve on your 2008, 2009 or 2010 6.4L Ford Powerstroke without throwing any codes" (Product No. GBZ-EF1.0-FD40),

- "Unit ships with Off-Highway software installed allowing EGR and DPF delete without any limp mode or check engine light" (Product No. RME-Tuner-07-12), and

- "This product does support emissions removal for trucks that are intended to be used for race use only. It is the responsibility of the customer to know their local laws, and adhere to them. Motor Ops is not responsible for the fraudulent use of this product" (Product No. MOP-5k-CM-0609).

117.   The product manuals and/or installation instructions for certain of the

Corporate Defendants' Defeat Tunes illustrate how they bypass, defeat, or render

inoperative EGR, DPF, DOC, SCR, NAC, and OBD.  For example, the instruction

manual for Corporate Defendants' most popular Defeat Tune (H&S MiniMaxx

Race Tuner Programmer, Product No. H&S-109003-R) includes the following

statements:

- "Please follow these instructions carefully to unplug and disable the EGR system,"

- "If you have removed or modified this emissions system (or plan immediately after installing this device), proper tuning must be installed or the vehicle will not operate correctly,"

- "When running High Sulfur tuning, it is recommended that all sensors located in the factory exhaust system be unplugged from the electrical harnesses," and

- "The UREA system must at least be unplugged but can be completely removed from the vehicle if desired. Failure to unplug the UREA system may result in a check engine light and/or dash messages. Follow these instructions to unplug the UREA system…."

118.   Each Certified Stock Calibration is an "element of design installed on or in a motor vehicle or motor vehicle engine in compliance with [CAA] regulations" within the meaning of Section 203(a)(3)(B) of the CAA, 42 U.SC. § 7522(a)(3)(B).

119.   Each of Corporate Defendants' Defeat Tunes is and has been intended for use with certified motor vehicles and motor vehicle engines, including Powerstroke engines in Ford vehicles, Duramax engines in GM vehicles, and Cummins engines in Dodge vehicles.

120.   A principal effect of each of Corporate Defendants' Defeat Tunes is, and has been, to bypass, defeat or render inoperable a Certified Stock Calibration related to a motor vehicle's EGR System, Aftertreatment System, engine operation and combustion, and/or OBD System.

121.   Corporate Defendants knew or should have known that each of Corporate Defendants' Defeat Tunes was intended for use or put to such use.

122.   Each copy of Corporate Defendants' Defeat Tunes is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B).  42 U.S.C. § 7524(a).

123.   For each violation of Section 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B), Corporate Defendants are each liable to the United States for injunctive relief and civil penalties of up to the amounts set forth in Paragraph 45 above.

**FOURTH CLAIM FOR RELIEF**
***Violations for Removing or Rendering Inoperative
Emissions-Related Devices or Elements of Design***

124.   Paragraphs 1 through 82 of this Complaint are re-alleged and incorporated herein by reference.

125.   From April 15, 2015, to February 15, 2018, Defendant Diesel Ops installed or caused persons (including, but not limited to, their employees) to install EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products, and Defeat Tunes on or in motor vehicles and/or motor vehicle engines after the sale and delivery of the vehicle and/or engine to the ultimate purchaser.

126.   Diesel Ops' installation of EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products and Defeat Tunes (or the causing thereof) removed or rendered inoperative devices or Emissions-Related Elements

of Design that had been installed on or in motor vehicles or motor vehicle engines in compliance with the regulations promulgated under Title II of the CAA.

127.   Diesel Ops knew that it was installing the EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products, and Defeat Tunes.

128.   Each installation of EGR Delete Hardware Products, Aftertreatment System Delete Hardware Products or Defeat Tunes by, or caused by, Diesel Ops on each motor vehicle or motor vehicle engine constitutes a separate violation of Section 203(a)(3)(A) and (B) of the CAA, 42 U.S.C. § 7522(a)(3)(A) and (B).

129.   For each violation of Section 203(a)(3)(A) and (B), 42 U.S.C. § 7522(a)(3)(A) and (B), Diesel Ops is liable to the United States for injunctive relief and civil penalties of up to the amounts set forth in Paragraph 45 above.

### FIFTH CLAIM FOR RELIEF
*Fraudulent Transfer Under Section 3304(b)(1)(A) of the FDCPA*

130.   Paragraphs 1 through 82 of this Complaint are re-alleged and incorporated herein by reference.

131.   Following receipt of an information request issued to Diesel Ops and First Finding of Violation, Diesel Ops transferred substantially all of its assets to Mr. Piccolo and other members of Diesel Ops with actual intent to hinder, delay, or defraud the United States within the meaning of Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. § 3304(b)(1)(A).

132.   Diesel Ops made the transfers to avoid paying the United States a debt and in a manner that exhibits the badges of fraud set forth in Section 3304(b)(2) of the FDCPA, 28 U.S.C. § 3304(b)(2).  The transfers had the effect of hindering collection efforts and were fraudulent as to a debt of the United States under Section 3304(b)(1)(A) of the FDCPA, 28 U.S.C. 3304(b)(1)(A).

133.   Mr. Piccolo is a transferee against whom the United States may recover judgment under the FDCPA, 28 U.S.C. § 3307(b).

## SIXTH CLAIM FOR RELIEF
### *Violations for Failure to Establish and Maintain Records and Respond Accurately and Completely to Requests for Information Pursuant to 42 U.S.C. § 7542*

134.   Paragraphs 1 through 82 of this Complaint are re-alleged and incorporated herein by reference.

135.   Mr. Piccolo is a person subject to Part A (Motor Vehicle Emission and Fuel Standards) of Subchapter II of the CAA.

136.   The information request issued to Mr. Piccolo required him to, *inter alia*, provide information regarding each product he offered for sale or sold that bypasses, defeats, or renders inoperative various Emissions-Related Elements of Design.

137.   By failing to provide written responses to the information request, Mr. Piccolo violated Section 208(a) of the CAA, 42 U.S.C. § 7542(a).

138.    Section 203(a)(2)(A) of the CAA, 42 U.S.C. § 7522(a)(2)(A) makes violating Section 208(a) of the CAA, 42 U.S.C. § 7542(a) a prohibited act under the CAA.

139.    For each violation of Section 208(a) of the CAA, 42 U.S.C. § 7542(a), Mr. Piccolo is liable to the United States for injunctive relief and civil penalties of up to the amount set forth in Paragraph 45 above.

## RELIEF REQUESTED

WHEREFORE, the United States respectfully requests that this Court:

A.    Assess civil penalties against each Corporate Defendant for each part or component that each Corporate Defendant manufactured, sold, or offered for sale in violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B) or caused the manufacture, sale, or offer for sale thereof, in the amount up to $3,750 occurring on or after January 13, 2009, through November 2, 2015, and up to $4,876 for each violation occurring after November 2, 2015;

B.    Assess civil penalties against each Corporate Defendant for each motor vehicle or motor vehicle engine on which Corporate Defendants removed or rendered inoperative or caused to remove or render inoperative, and for each part or component they installed that removed or rendered inoperative, or caused to remove or render inoperative, a device or element of design in violation of Section 203(a)(3)(A) of the CAA, 42 U.S.C. § 7522(a)(3)(A), in the amount up to $3,750

occurring on or after January 13, 2009, through November 2, 2015, and up to

$4,876 for each violation occurring after November 2, 2015;

C.      Permanently enjoin each Corporate Defendant from manufacturing,

selling, offering to sell, or installing motor vehicle parts or components intended

for use with a motor vehicle or motor vehicle engine where a principal effect of

such part or component is to bypass, defeat, or render inoperative any device or

element of design installed on or in a motor vehicle or motor vehicle engine in

compliance with Title II of the CAA;

D.      Order the Corporate Defendants to take other appropriate actions to

remedy, mitigate, and offset the harm caused by their alleged CAA violations;

E.      Enter judgment pursuant to 28 U.S.C. §§ 3306(a) and 3307(b) in favor

of the United States against Diesel Ops and Mr. Piccolo ordering each of them to

pay the United States up to the amount of the fraudulent transfers, to the extent

necessary to satisfy Diesel Ops' debt under the CAA;

F.      Assess civil penalties against Mr. Piccolo for failing to provide

written responses to the information request in violation of Section 203(a)(2)(A) of

the CAA, 42 U.S.C. § 7522(a)(2)(A), up to $4,876 for each violation occurring

after November 2, 2015.

G.      Order Mr. Piccolo to provide written responses to the information

request and permanently enjoin Mr. Piccolo from manufacturing, selling, offering

to sell, or installing motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with Title II of the CAA;

H.    Award the United States its costs and disbursements in this action; and

I.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

TODD KIM
Attorney General
Environment & Natural Resources Division
United States Department of Justice

/s/Matthew C. Indrisano
MATTHEW C. INDRISANO
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington D.C. 20044-7611
(202) 514-1398
matthew.indrisano@usdoj.gov


SAIMA SHAFIQ MOHSIN
Acting United States Attorney
Eastern District of Michigan
JOHN POSTULKA
Assistant United States Attorney
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9118
john.postulka@usdoj.gov


OF COUNSEL:

ANDRE DAUGAVIETIS
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Boulevard
Chicago, IL 60604